All right. Sounds like we're good to go. So I've called the case. Each side, you have 15 minutes total. So we're ready for the petitioner. I would like to reserve about two minutes, Your Honor. Okay. And just state your name and your appearance for the record. R. Wayne McMillan, representing the petitioner Carlos Cardona Haro. Thank you. I'm sorry. How many minutes for rebuttal, you said? Pardon? How many minutes for rebuttal? Two. Two. Okay. If it pleases the Court, Mr. Haro was born in Mexico, his family, and he became permanent residents in 1990. In 1999, at the age of 27, he was involved in a serious car accident where he had severe head trauma. His legs were crushed, and it resulted in one foot being amputated. He spent a couple – and his friend, by the way, who was driving the car was killed. He spent two years in a wheelchair and began suffering from schizophrenia, depression, anxiety, and that continued until 2018. He moved out of his home. He became homeless, did not take any medication, and in April of 2018, shortly after moving out of his home, he was charged with assault by throwing a piece of broken concrete at someone, injuring them. He was found not competent to stand trial. He was held in Patton State Hospital for a period of time until his – So unlike the previous case, your client has been in mental health facilities, correct? At least that time. It's not in the record as to any facility that he was in before 2018, and I don't think he was. I think he had care, but not a lockdown. So he credibly testified that he knew the importance of taking his medication and was able to keep himself to both doctor's appointments and the pharmacy, and the IJ found that was sufficient to show he was unlikely to have a relapse. Are there facts in the record that contradict that specific finding? Well, the actual facts that were testified to by his mom and by the respondent, and based upon the facts surrounding the crime that brought him into immigration court, he was in his home surrounded by a loving family and decided one day just to move out and not take the medication. I don't think that schizophrenics deciding not to take the medication is a real planned out and thoughtful decision. I think it's a slippery slope. Wake up one morning feeling great, wake up the next morning not feeling so great, not take the medication, take the medication. But once you begin sliding down, you cannot just recoup yourself. You do need to have intervention to take care of him. He's demonstrated that on his own with no support group, living on the streets, that he was not able to take his medication. Well, he's not here now, right? Is he in Mexico? Where is he? He is living in Mexico on the streets, and his family has very little communication with him. There's someone in Tijuana that met him and contacted the family, but he's not a family member. So your first argument is he's going to relapse, the likelihood of the relapse. But let's just say, well, you have to over, there is some evidence that he understands what he's supposed to do, and the IJ seems to rely on that, so we have to look at that. But let's just assume that, for purposes of argument, that the IJ erred in determining the likelihood of petitioner suffering a relapse leading to confinement in a mental health facility. But we also have a case out there called Villegas v. Mukasey, a matter of JRGP, that state the general evidence of conditions in Mexico, in Mexican mental health facilities, is not sufficient to establish a likelihood of torture. So what is your best case for the proposition that conditions in Mexican health, in mental health facilities, constitute torture? We not, he testified, and we're also arguing, Your Honor, that it is not merely the condition in the mental health facilities. It is possibility of running into the police, being accosted by the police, being on the street in a schizophrenic condition, and being arrested and placed in jail, and possibly suffering harm from his police encounters. Well, he's not eligible for asylum or reholding, right, because of his aggravated felonies. So we're just talking about the cat. And if there's precedent out there that says you have to show intent to prove torture, why doesn't that just end the inquiry here? Well, the definition of torture not only includes intent, it includes acquiescence. It is our opinion that the Mexican government acquiesces to types of harm that a schizophrenic or mentally ill individual might suffer, or more likely than not suffer, at the hands of the police. I don't think this country of Mexico has any particular policy of torturing schizophrenics, but I do think based upon their lack of mental health facilities, they acquiesce to the fact. Can you point me to places in the record where you presented evidence to the IJ of this acquiescence by Mexico to torture? I don't think that was argued in the record. I think that is stated in the definition of torture. Right, but what I'm asking is where you presented the evidence to the IJ that this was going to be the conduct by Mexican authorities. The respondent testified to that, and in addition, in the medical country condition reports, the mental health country condition reports that we submitted, there were numerous anecdotal situations where people were suffering and possibly subject to lobotomies, among other things, being held in restraints for long periods of time, held for their entire life without having any contact with family or with any effective treatment. The IJ mentioned that it didn't think that it had been established that the conditions that exist in mental facilities had the intent to torture the residents in those facilities, but I don't find anywhere a finding that the IJ said that the conditions in those facilities would not rise to the level of torture. Have I missed a finding that the IJ or the BIA made on that? The IJ simply made a finding that the medical facilities, health care facilities in Mexico were excellent, in his words, excellent. And we don't have any reason to dispute that, but we are disputing that the mental health facilities and health care, mental health care in Mexico is not excellent, but in fact horrible in many cases. Through both articles we submitted, the anecdotal information contained in those articles, it's simply not on par with what he would receive here. The government decided to, well, it's not the petitioner's position that he would simply not take his medical, his meds. It is that he would fall into a situation where he wouldn't be able to or wouldn't know to, and that would just spiral him down into the position that he would fall into either police custody or mental health facilities, substandard mental health facilities. Does the record have to compel that result? Does the record have to compel that result for you to prevail on the relapse issue? I don't think it has to compel it. I think it's more likely than not that he would, in fact, relapse. Well, but the IJ found that he knew the importance of his medication, and the IJ believed that he would take his medication and that under all of the circumstances that were present, that relapse was not likely. So to overcome that, does the record have to compel what you want us to find? The respondent had been, excuse me, the petitioner had been in custodial. Well, any time I ask a direct question, there isn't a yes or a no. I guess I'm going to, my old cross-examination skills are going to say, can you give me a yes or no answer and answer the question, counsel? Does the record, must the record compel what you're asking us to find? I think it does compel. Okay, so the standard of review is it must compel. It is more likely than not. And when he testified, when he was in court, he had been in. So I don't think I still got an answer. Is the standard it must compel it, and then yes, but you think the record does compel it. Is that your answer? Is that your best answer? Do you want to call a friend? I think it does compel a finding that if he did not take his medication, he would relapse. But it also compels a finding that his failure to take medication is something that he could have no control over. It's not an intentional act on his part. I think it would be an almost certainty that without family support, without any type of monitoring that he would not take his medication for various reasons, that schizophrenics don't take their medications. And once he didn't for the day or the next day or the next day, he would relapse into a situation. He is currently living on the streets. It was brought out in testimony that he had no support group in Mexico. And so what was argued has, in fact, happened. All right. If we don't have additional questions, do you want to save the balance for a rebuttal? No, I'll just wait. Thank you. I'll reserve the conclusion. Okay. You have three minutes left. Okay. The government, we're ready for you. Okay. May it please the court. Can you hear and see me? Yeah, keep your voice up, but we can hear you. Okay. May it please the court. I'm Susan Green for the Attorney General. Your Honors, in these Convention Against Torture Application cases, it is, of course, extremely important that the immigration judge carefully develop and rely on the evidence about the specific applicant. And that is exactly what the immigration judge did in this case. Well, I guess let's just since that we're jumping to that. Given multiple examples of petitioners' past of mental health events requiring hospitalizations despite ongoing medical treatment, is there actually substantial evidence supporting the IJ's finding that merely the access to health care and medication will prevent another relapse? Yes, Your Honor. Because the immigration judge questioned him extensively about whether in his current state of lucidity, which he was in at the hearing, did he understand the need to take the medicine. And he said over and over again that he did well when he took the medicine. He fully understood that he needed to take the medicine. He identified the medicines he needed to take, including the milligram dosage. Yes, indeed. Well, but it isn't anyone that's like in the courts or in otherwise dealt with mental illness. You know, counsel for the petitioner makes a point. Of course he understands it when he's enjoying good mental health. But as he degenerates, then that clarity becomes less clear. And a lot of people, you know, stop taking their meds. And he obviously has had events where he has stopped taking his meds. It is true that there have been times. He has had a long history, and the history certainly from 2012 through 2016 showed that he had a lot of trouble getting adjusted. He had, at that point, there were three different occasions when he did check into a mental hospital. He was checked into a mental hospital to adjust his medications. But he testified that the medications that they finally arrived at in 2016, those three drugs, the combination of the cogentin, Haldol, and Remeron, that that worked for him and that he did very well in that. He did well. Let me ask you this. Hypothetically, let's say that the petitioner had testified, I don't need medication and I'm not going to take it. If the rest of the record were the same, would the record support a finding that he's not likely to relapse? No, I don't think so. I mean, I think the whole point of the immigration judge's finding was that he seemed to have the lucidity and understand that the consistency was key. He said that. That was a quote from Mr. Haro at one point, page 171. He said, consistency is the key. He has been through a long road, and that's true, but he seemed to have learned that it did not work out for him. In 2018, when he was asked what went on there, he said he decided that he was with someone who wouldn't abide by his own, and that did not work out for him. So I think the immigration judge concluded that at the time that he talked to him, he was lucid, and the times when he had, every time when the immigration judge asked him, like, you know, you wind up in this bad situation, it was times when he agreed that he hadn't taken his medicine, and Mr. Haro said consistency is the key. Given that record, it's really hard to swallow the weight you want to put on his testimony directly in that hearing at a time when he's doing well. It just doesn't make any sense. Why wouldn't we, and why shouldn't the agency, have looked at the course of conduct over what he's saying in a moment in a hearing when he's probably prepped? I think that the agency did look at the course of conduct, and that they concluded that he now had a successful medical regime, and that he had made progress, Your Honor. I feel like I'm arguing with you a little bit at this point, but in the context of mental health, and particularly in schizophrenia, I have some familiarity with that, having been a state court judge and dealing with that every day. Both things can be true. It can be true that he's had experiences to realize that I really need to do this, I'm better when I do this, and also that in the future, he won't do this. Both can be true, and are likely going to be true. Your Honor, I understand that there is uncertainty here, and certainly if the court were to find the facts in the first instance of your role, I mean, I certainly understand what you're saying. I also think that there is uncertainty, and it was his burden of proof to show that he was going to relapse, and the immigration judge looked at evidence that could go either way and concluded that. Okay, so let's assume, hypothetically, that there's evidence that you could look at it either way, that there's evidence that he's not going to relapse, and there's evidence that he could likely relapse. What is our standard of review? If we want to counsel for the petitioner, I asked him, does the record have to compel that result, or what's your position on that? Okay, well, first of all, the party with the burden of proof, if it's uncertain, the party with the burden of proof has lost, they haven't carried their burden of proof. So if you were to find that it's uncertain, then I think under the standard of review, that standard of review is that the evidence has to compel the opposite result than the immigration judge reached. And I think if it is uncertain, then the evidence does not compel the opposite result. So let me ask you this. Let's just say we don't, and I don't know what, we haven't conferenced on this, so we're just talking hypotheticals at this point. Let's say if this panel were to determine that the BIA erred in finding the petitioner was unlikely to suffer a relapse, must we remand to the agency for further proceedings? Yes, Your Honor. And I said this in my brief. The immigration judge made an alternative finding that, you know, obviously that would just be the very first step for a CIT case. The next thing you would have to show is that there was likelihood that somebody would have the specific intent to cause suffering, and they would do so either with a requisite state role, either that it would be a state actor. I'm going to tell you, I think I know your first answer should have been no, that you don't have to remand. What you said when you answered my question, you said yes, and then the record had, I think you mean no. Okay, Your Honor, and this is what I'll explain, and I explained this in my brief. The immigration judge made that alternative finding, but then the Board of Immigration Appeals, when they reviewed, they only discussed the first finding. They didn't discuss the alternative finding. And I made the decision in briefing, I thought that the Board of Immigration Appeals had not discussed that second alternative finding. That was a close call. I was trying to be conservative. Well, was this a Burbano case, or was it a DeNovo review? They did cite Burbano, Your Honor, indeed, and yet I was trying to be very cautious. And it's maybe that you disagree with my conclusion about the Burbano. In that case, it's certainly, I could argue from the record that the immigration judge was right on that alternative finding, because the record is quite, there is not evidence in the record that anybody would have specific intent. So I think the record certainly supported the immigration judge's conclusion. And I certainly think that the record supports that finding. I was just trying to be very conservative about not trying to argue something that I couldn't tell for sure that the Board had endorsed. So what about the Villegas case? Does Villegas, is that controlling on this panel? Well, the Villegas case, certainly, I mean, the Villegas case is still good law in the Ninth Circuit, of course. And there's the more recent Hernandez case that I cited to the court in my 28J letter. And it also, you know, it's in that same line of cases. It's even closer because it was a case that was just like this one in that the immigration judge made the finding that a schizophrenic person was going to have access to their medicines and would not wind up in an institution. But then it also said that even if they did wind up in the institution, there was no evidence that anyone would harm that person with specific intent to cause suffering. So, yes, certainly Villegas is still good law, and it's being followed. The Hernandez case that I just referred to is a precedential decision that I believe is from 2022. It's very recent. Sorry, it was decided after I briefed the case, and that's why I sent a 28J letter on it. So, yes, the evidence would support a holding on the basis of the Villegas case. Yes. Let me see. Do my panelists have additional questions? We don't have additional questions, so you're either free to use the balance of your time or you can submit. If you don't have additional questions, I'll simply ask the court to deny the position for review. Thank you, Your Honor. You don't want to use your three minutes? I'm sorry. I'm sorry, too, but I'm having a little trouble with my… Okay. So, yes, and we can only pick up when we're recording. I'm sorry. So you have three minutes if you want to use it. That's up to you. She's waived the balance of her time. I think all the points have been made, and I think I've made mine. Thank you for listening, Your Honor. All right. Thank you both for your arguments in this matter. This will stand submitted then. All right. This court then is in recess for the day. All rise. Court is in recess for the day.
judges: CALLAHAN, FORREST, THOMAS